ERIC A. SEITZ
ATTORNEY AT LAW
A LAW CORPORATION

ERIC A. SEITZ                    1412
JONATHAN M.F. LOO          10874
820 Mililani Street, Suite 502
Honolulu, Hawaii 96813
Telephone:  (808) 533-7434
E-mail(s):    eseitzatty@yahoo.com
                  jloo33138@yahoo.com

DENTONS US LLP

PAUL D. ALSTON               1126
CLAIRE WONG BLACK        9645
RICHARD M. CRUM           11499
American Savings Bank Tower
1001 Bishop Street, 18th Floor
Honolulu, Hawaii 96813
Telephone:  (808) 524-1800
Email(s):    paul.alston@dentons.com
                  claire.black@dentons.com
                  rick.crum@dentons.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| DONNA OPULENTO, on behalf of the Estate of JESSICA FORTSON; FRANK HAMPP, and JOSEPH TUI, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>    vs.<br><br>STATE OF HAWAIʻI DEPARTMENT OF PUBLIC SAFETY; TOMMY JOHNSON, Director, Hawaiʻi Department of Public Safety; GAVIN TAKENAKA, Health Care Director, Hawaiʻi Department of Public Safety, Corrections Division; DOES 1-30,<br><br>        Defendants. | CIVIL No. <u>19-00315 LEK-RT</u><br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF; DEMAND FOR JURY TRIAL** |

## <u>SECOND AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF</u>

Plaintiffs DONNA OPULENTO, on behalf of the Estate of Jessica Fortson, FRANK HAMPP, and JOSEPH TUI, Individually (hereinafter, collectively "Plaintiffs") and on behalf of the proposed Class of all other persons similarly situated, by and through their undersigned attorneys, allege as follows:

## NATURE OF ACTION

1. This is a class action lawsuit seeking injunctive and declaratory relief from the Defendants State of Hawaiʻi Department of Public Safety (hereinafter "DPS" or "Department"), Tommy Johnson, in his official capacity (hereinafter, "Johnson"), Gavin Takenaka, in his official capacity (hereinafter, "Takenaka"), and DOES 1-30 (hereinafter, collectively "Defendants").

2. Plaintiffs also seek appointment of a Special Master to manage the mental health branch of the Corrections Division at the DPS.

3. This action arises out of Defendants' unconstitutional and illegal treatment of inmates with serious mental illnesses incarcerated in Hawaiʻi's eight jails and prisons: Hawaiʻi Community Correctional Center ("HCCC"), Kauai Community Correctional Center ("KCCC"), Maui Community Correctional Center ("MCCC"), Oahu Community Correctional Center ("OCCC"), Halawa Correctional Facility ("Halawa"), Waiawa Correctional Facility ("Waiawa"), Kulani Correctional Facility ("Kulani") and the Women's Community Correctional Center ("WCCC") (collectively, "Hawaiʻi's Correctional Facilities"). The DPS also houses over 1,400 inmates from Hawaiʻi at an out-of-state facility in Arizona.

4. Defendant DPS incarcerates people with serious mental illnesses at dangerous and disproportionately high rates. Defendants subject people with serious

3

mental illnesses to extreme isolation with little or no mental health treatment. According to a former OCCC mental health director, close to eighty percent of Hawaiʻi's jail and prison inmates have a mental health issue. Twenty percent have a serious and persistent mental illness as defined in the Diagnostic and Statistical Manual of Mental Disorders.

5. Upon information and belief, the two largest correctional facilities both hold more seriously mentally ill individuals than are held at Hawaiʻi State Hospital. Yet Defendants fail to provide adequate mental healthcare, including basic measures to prevent suicide and self-harm. Defendants' failure to provide minimally adequate mental health treatment -- combined with the deplorable conditions of confinement in the prison and jails -- exacerbates individuals' existing mental illnesses and increases the likelihood that people will suffer serious decompensation or death.

6. Hawaiʻi prisons have the seventh highest suicide rate in the country. Upon information and belief, at least 26 inmates have committed suicide in Hawaiʻi prisons and jails since 2010.

7. Defendants have been aware of the constitutionally and legally inadequate mental health care and conditions in its prisons and jails for years. In 2008, the United States Department of Justice (hereinafter, "DoJ") sued the DPS for "deliberate indifference to the mental health needs" of inmates at OCCC. The

4

lawsuit led to a court-sanctioned settlement agreement (hereinafter "DoJ Settlement Agreement"), which kept the department under federal oversight until it could raise the level of care at OCCC to DoJ standards -- a process that was not completed until 2015.

8. A rash of recent prison suicides indicates that Hawaiʻi's correctional facilities are again violating constitutional standards for the care of inmates with mental illnesses.  According to a report by the Hawaiʻi House Concurrent Resolution 85 Task Force, in the four-month period from July to November 2017, there were four suicides in the state's correctional facilities.  Many more individuals have attempted suicides resulting in grave injuries as serious as permanent paralysis.

9. Defendants' long-standing pattern and practice of neglect has directly caused serious ongoing irreparable harm to Plaintiffs and similarly situated individuals and contributes to a revolving door of incarceration that is both costly and detrimental to public safety.

## JURISDICTION AND VENUE

10. This court has original jurisdiction to hear this matter pursuant to 28 U.S.C. Sections 1331 and 1343, *inter alia*.  Any and all state law claims contained herein are part of the same case or controversy giving rise to the federal law

5

claims and therefore fall within the Court's supplemental jurisdiction pursuant to 28 U.S.C. Section 1367.

11. Venue is proper in the United States District Court for the District of Hawaiʻi pursuant to 28 U.S.C. Section 1391 as all Defendants to the litigation reside in the state of Hawaiʻi, and all actions and/or omissions giving rise to the claim occurred and continue to occur in the State of Hawaiʻi.

## **PARTIES**

12. Plaintiff DONNA OPULENTO (hereinafter, "Ms. Opulento"), is and has been a resident of the County of Hawaiʻi, State of Hawaiʻi, at all times pertinent hereto. Plaintiff Ms. Opulento was Ms. Fortson's natural mother.

13. Plaintiff Estate of JESSICA FORTSON (hereinafter, "the Estate") is an Estate created and administered under the jurisdiction of the State of Hawaiʻi. The Circuit Court of the First Circuit of the State of Hawaiʻi appointed Ms. Opulento as the personal representative of the Estate. Jessica Fortson (hereinafter, "Ms. Fortson") was a resident of Hawaiʻi at all times relevant to the claims raised in this Complaint.

14. Plaintiffs Frank Hampp and Joseph Tui are and have been residents of the County of Honolulu, State of Hawaiʻi, and inmates incarcerated at the Halawa Correctional Facility at all times pertinent hereto.

15.  Defendant DPS is a public entity, duly organized and existing under the laws of the State of Hawaiʻi.  Pursuant to the laws of the State of Hawaiʻi, DPS is authorized and required to establish and adhere to procedures and policies to ensure the physical, emotional, and mental health and safety of prisoners under its jurisdiction.  DPS is also required to hire, supervise, and train its employees to ensure that they carry out the policies and procedures of DPS and preserve the safety of prisoners incarcerated in all correctional facilities in the State of Hawai'i.  At all times relevant to the facts and claims set forth in this Complaint, DPS was, and is, responsible for the acts and/or omissions and the policies, procedures, and practices of its officers, managers, employees, and/or agents.

16.  Defendant DPS operates and manages: HCCC, KCCC, MCCC, OCCC, Halawa, Waiawa, Kulani, and the WCCC.  The DPS also houses over 1,400 inmates from Halawa at an out-of-state facility in Arizona.

17.  The DPS has at all relevant times been responsible for the actions and/or inactions of its officers, managers, employees and/or agents.  Further, DPS has at all times relevant to this matter been required to ensure that all of its policies, procedures, and practices as well as all applicable statutes, administrative code and department regulations are adhered to completely

and fully by Hawai'i's eight jails and prisons and their officers, managers, employees, and agents.

18. At all times relevant to this matter, Defendant JOHNSON is and has been the Director of the DPS and is and has been a resident of the State of Hawai'i at all times pertinent hereto. Defendant Espinda is sued in his official capacity as Director of the DPS for actions he took, and omissions he made, under color of state law.

19. Defendant Takenaka is the Health Care Director of the DPS's Corrections Division. Takenaka is and has been a resident of the State of Hawai'i at all times pertinent hereto. Takenaka is sued in his official capacity as Health Care Director of DPS's Corrections Division for actions he took, and omissions he made, under color of state law.

20. DOES 1-30 (hereinafter, "Doe Defendants") are individuals whose true identities and capacities are as yet unknown to the Plaintiffs and their counsel, despite diligent inquiry and investigation, and who are responsible in some manner for the occurrences and Plaintiffs' damages, as herein alleged. The true names and capacities of Doe Defendants will be substituted as they become known. Plaintiffs are informed and believe, and thereupon allege, that at all times herein mentioned, Doe Defendants were the agents, servants, and/or employees of each of the other Defendants

and/or Doe Defendants and were acting with the permission and consent and within the course and scope of said agency and employment.  For purposes of this Complaint, DPS policymakers, administrators, and/or persons with supervisory or decision-making authority regarding the issues that are the subject of this Complaint are designated as DOES 1-10.  DOES 10-20 are DPS employees without supervisory or decision-making authority including but not limited to: DPS correctional officers, correctional staff, and mental health employees.  DOES 20-30 are all other persons who may be liable on the Complaint but who have not yet been discovered and named.  DOES 1-30 are sued herein in their official capacities.

## CLASS ALLEGATIONS

21. Plaintiffs bring this action individually and in their representative capacities on behalf of all others similarly situated pursuant to Fed. R. Civ. P. Rule 23. This action satisfies all requirements of Rule 23: numerosity, commonality, typicality, fair and adequate representation, and predominance and superiority.

22. The proposed Class members consist of:

> All inmates who are incarcerated in a jail or prison in Hawai'i, or who have been incarcerated in a jail or prison in Hawai'i within the applicable statute of limitations period preceding the filing of this action, and who have a serious and persistent mental health illness defined as an

Axis I or Axis II disorder in the Diagnostic and Statistical
Manual of Mental Disorders, Fifth Edition (the "Class").

23. The proposed definition of the Class may be amended by the Plaintiffs prior to certification by the Court if such amendment is deemed necessary or appropriate, including the addition of any subclasses.

## A. CLASS ACTION REQUIREMENTS

### Numerosity: Fed. R. Civ. P. 23(a)(1)

24. The proposed members of Plaintiffs' Class are so numerous that joinder of all the members is impossible. The proposed Class consists of thousands of inmates who are or who have been incarcerated in a Hawaiʻi jail or prison and who have a serious mental illness or mental disorder. According to the DoJ Bureau of Justice statistics, the DPS was responsible for the management of 5,600 adult inmates, of whom close to 20 percent have, or will have, a serious mental health issue. The DPS has records detailing requests from inmates for mental health assistance and the resulting action by health care personnel, thus making practical the identification and notification of potential class members.

### Commonality: Fed. R. Civ. P. 23(a)(2)

25. There are significant issues of law and fact in this case that are common to the proposed Class as a whole, and central to resolution of the core issues in

this matter.  The nature and scope of the proposed Class claims expose the gravity of the Defendants' reckless disregard for the safety and well-being of inmates with serious mental health issues and the full extent of the damage.  Moreover, a class action proceeding will best equip the Court with the information necessary to resolve the fundamental problems within the Department.  Class litigation is the superior method to manage such comprehensive claims and will afford a large number of similarly harmed persons the ability to pursue this action in circumstances where individual claims are minimal, thus promoting economic efficiency and promoting a fair and judicially efficient resolution of the issues.  Without such litigation, Defendants have no incentive to reverse the current course of deliberate inaction and neglect of responsibility, thereby causing continued and intolerable harm to inmates with serious mental illnesses.

26. Some questions of law and fact that are common to the proposed Class include whether Defendants:

    a.    Failed to operate a mental health care system that provides minimally adequate mental health care;

    b.    Have been deliberately indifferent to the resulting harm and risk of harm to inmates with mental health issues;

c.   Failed to exercise reasonable care or otherwise take reasonable precautions to prevent inmate suicides;

d.   Locked inmates in seclusion due to untreated mental illness in the absence of immediate safety or security concerns;

e.   Failed to provide mental health employees with the proper education, training, and oversight to appropriately respond to the needs of inmates with mental health issues.

27.   The questions of law and fact are common questions which are capable of class-wide resolution.  The types of mental illnesses of individual Class members are varied, but central to every proposed Class member is the Defendants' failure to provide for the safety and well-being of inmates with mental health issues.

<u>Typicality: Fed. R. Civ. P. 23(a)(3)</u>

28.   The claims of the representative Plaintiffs are typical of the claims of the proposed Class.  Plaintiffs and all other members of the proposed Class have sustained similar injuries arising out of and caused by Defendants' policies, practices, procedures, and customs in violation of the law as alleged. Because the claims of the representatives are typical of the proposed Class as a whole, the absent Class members will be protected in a manner that is both economic and efficient.

12

<u>Adequacy: Fed. R. Civ. P. 23(a)(4)</u>

29.  The representative parties will fairly and adequately protect the interests of the proposed Class.  Plaintiffs have suffered adverse consequences as a direct result of the Defendants' inaction with respect to the needs of inmates with mental health issues, and are committed to vigorously pursuing all available legal remedies.  All Class representatives have a strong desire to see that corrective action is taken in an effort to prevent future harm to themselves, and other mentally ill inmates.  Similarly, Plaintiffs' counsel has an extensive history as one of Hawai'i's leading civil rights litigation firms.  Counsel has always been firmly resolved to protecting the rights and interests of clients, and will zealously pursue this matter on behalf of the proposed Class.  To the best of counsel's knowledge, neither counsel nor the representative Plaintiffs have any conflicts of interest with other proposed Class members that would prevent or interfere in any way with counsel's representation of the proposed Class or the claims asserted and relief sought herein.

<u>Fed. R. Civ. P. 23(b)(2)</u>

30.  The Defendants, having been presented with innumerable opportunities to protect the mental health population and prevent suicides and other mental health-related injuries, have refused to act on behalf of the named Class.

Such inaction applies generally to the entire proposed Class, and injunctive relief and/or declaratory relief are the appropriate means to protect the proposed Class as a whole.

<u>Fed. R. Civ. P. 23(b)(1)(A) and (B)</u>

31. The questions of law and fact regarding the Defendants' repeated and deliberate indifference towards the safety and well-being of inmates with serious mental health issues are central to the Plaintiffs' Complaint, and are the predominant questions driving this litigation. The differing factual claims of individual Class members are not a roadblock to Class certification when the claims central to all proposed Class members predominate, and a Class-wide judicial solution is not only practical, but remains the superior method for a fair and efficient resolution of the Plaintiffs' claims. The primary interest of the proposed Class members is to see change in the Defendants' policies, procedures, and practices, and there is little interest to individually control separate actions. Moreover, maintaining class status is preferable for achieving the desired results, and will not present any exceptional difficulties.

**COMMON FACTUAL ALLEGATIONS**

32. Defendant DPS has a policy and practice of failing to provide sufficient mental health care to the more than 1,000 individuals with serious mental

14

health needs in its prisons and jails.  Those individuals suffer from severe mental illnesses, and many experience symptoms such as paranoia, auditory and visual hallucinations, and persistent thoughts of self-harm.

33. Defendant DPS's mental health system is defined by severe staffing shortages, an inadequate screening and assessment process, significant delays in access to clinicians and medications, a dearth of treatment and services, inadequate treatment space, and an overreliance on harsh, restrictive housing units.  Defendant DPS's system of care is wholly inadequate to meet the significant and growing mental health needs of its population.

I.   **Defendants Fail to Provide Minimally Adequate Mental Health Care in Its Jails and Prisons**

34. Defendants refused to provide necessary treatment to Ms. Fortson, Mr. Hampp, Mr. Tui,  (hereinafter, collectively "Inmates") and others similarly situated for their mental illnesses.  Inmates and the proposed Class members often go months without seeing a mental health provider, experience significant delays in receiving prescription psychiatric medications, and are denied basic mental health care, despite repeated requests for treatment.

35. As a direct result of Defendants' practice of inappropriately delaying and refusing to provide basic mental health treatment, Inmates and the proposed

Class members' mental illnesses are allowed to progress unchecked, leading to hallucinations, delusions, and an increased risk of self-harm and suicide.

36. Upon information and belief, in 2018, most of Hawaiʻi's Correctional Facilities failed to receive certification from the National Commission on Correctional Health Care ("NCCHC"), an agency relied upon by the Department of Justice which sets the minimum standards for mental health care in state and federal correctional facilities.

**A. Professional Staffing for Treatment and Handling of Inmates with Mental Illness is Grossly Inadequate**

37. Many of the deficiencies of the mental health branch in Hawaiʻi's Correctional Facilities stem from severe staff shortages in the Health Care Division. The mental health staff that are hired are often unqualified to treat the mental health inmate population.

38. Only three of Hawaiʻi's jails and prisons have a mental health unit, and OCCC is the only facility with an acute mental health unit.

39. The only two mental health nurses for Hawaiʻi's mental health inmate population are stationed at one facility, OCCC. Every other state facility uses medical nurses who do not have the proper mental health training to treat inmates with severe and persistent mental illnesses.

40. There are no psychiatrists or mental health nurses on staff at KCCC, MCCC, HCCC, and Kulani (hereinafter "outer island correctional facilities"). There is no 24-hour medical coverage at the outer island correctional facilities either. Together, this means that there are periods of time at night and over the weekend when mentally ill inmates have no emergency options at all.

41. When the Department was under federal oversight, one of the two mental health nurses from OCCC would visit the outer island correctional facilities every two months to provide mental health training to their staff, but after the DOJ Settlement Agreement was completed in 2015, the Department refused to schedule mental health staff trainings at the outer island correctional facilities.

42. The absence of qualified mental health staff results in treatment of only a fraction of mentally ill inmates requiring attention. For the qualified staff that remain, there is not enough time to meet the mental health needs of the mentally ill inmate population. To cope with the shortage, mental health staff take short cuts, such as writing poor treatment plans or inappropriately staff therapy groups. When groups are inadequately staffed, the content of the sessions are watered down, ineffective, and inappropriate. Treatment plans are prepared for only 50% of inmates.

43. Because many of the existing mental health staff are unqualified to provide therapeutic or rehabilitative services to inmates with mental illnesses, the amount of actual rehabilitative services provided to inmates with mental illness has fallen to as little as 1 hour per week. Word-association exercises and coloring animals on pieces of paper or "worksheet activities" make up the remainder of their "therapeutic" hours.

44. Because lock-downs or solitary confinement make the mental health population easier to manage, lack of adequate staff has also meant more lock-downs for inmates with serious mental illness resulting in extreme isolation, with little or no mental health treatment. Defendants routinely warehouse these individuals in solitary confinement for 21 to 24 hours a day where they predictably deteriorate.

**B.  Defendants Fail to Identify or Respond Timely to the Mental Health Needs of Individuals in its Jails and Prisons**

45. Defendants have a long-standing practice of inadequately screening for mental illness during the booking process or during incarceration, ignoring clear signs of mental illness and requests for care and as a result routinely failing to document serious mental health symptoms, psychiatric medications, and treatment history.

46. Defendants' mental health screening process at intake is inadequate to identify the serious needs and risk factors of individuals in its jails and prisons. Nurses conduct intake assessments in a noisy and crowded booking and intake area, within earshot of custody staff and other people being interviewed and booked into the jail or prison. Privacy and confidentiality are compromised, reducing the likelihood that people will disclose mental health needs and risk factors for suicide. The intake assessment lacks critical questions regarding the individuals' mental health history and cognitive limitations, current mental health complaints, risk of self-harm and suicidality, history of suicidality during past incarcerations, and medication needs.

47. Defendants lack a system for triaging and following up timely on mental health referrals after intake, creating a significant risk that even someone who discloses mental health needs during the screening process, such as recent or current suicidal ideation, will not be timely seen by mental health staff, leaving them to suffer or further decompensate without treatment. In recent suicides at Hawaiʻi's Correctional Facilities Defendants had documented mental health referrals that had not led to a clinical mental health contact prior to the inmate committing suicide.

**C. Defendants Deny Mentally Ill Inmates the Proper Management and Administration of Psychotropic Medication, Therapy, and Inpatient Treatment**

48. Because of chronic understaffing and the staffing of unqualified mental health providers, mentally ill prisoners have insufficient interactions with psychiatrists; many receive at most a five or ten-minute interaction once or twice a year in which they are asked only if their medications are working. As a result, clinicians cannot make informed decisions about care.

49. Because they possess at most a glancing familiarity with their patients, clinicians are unable to meaningfully evaluate crucial decisions affecting safety and health, such as the clinical appropriateness of indefinite confinement in seclusion and other units that hold prisoners in long-term isolation with minimal opportunities for human interaction.

50. Defendants have a policy and practice of failing to monitor and provide follow-up treatment after prescribing psychotropic medications. There is little or no follow-up to evaluate the efficacy of prescribed medications, to ensure that dosages are adjusted properly to achieve therapeutic levels, or to evaluate prisoners for possible adverse side effects.

51. Defendants have a policy and practice of allowing ongoing monitoring of prisoners on psychotropic medication by psychology assistants or medication assistants who hand out medications. These lower level mental

health staff are not qualified to adequately convey an inmate's concerns or symptoms to a psychiatrist.

52. Some of Hawaiʻi's mentally ill inmates suffer from psychosis, a disorder that is marked by loss of contact with reality and disorganized thinking. Persons suffering from psychosis may have perceptual disturbances such as hallucinations, paranoia, delusional beliefs, and bizarre behaviors. Some of these very mentally ill prisoners require an inpatient level of care -- a structured program of psychosocial rehabilitation services coupled with individual therapy and appropriate medication management -- but they do not receive it. Defendants have failed to reliably provide inpatient mental health care to those prisoners whose serious mental health needs require it.

**D.   Defendants Fail to Provide Basic Pre-Release Discharge Planning to Individuals with Serious Mental Illnesses**

53. Defendants fail to adequately prepare inmates with mental illness for transition back to the community after their incarceration. Due to insufficient staff and resources, Defendants fail to supply medications to people receiving psychiatric medications in its facilities when they are released to the community, leaving people with dangerous gaps in treatment. Some inmates do not even know what their diagnosis is, what medications they take, or how to renew their prescriptions.

54. Defendants' failure to provide sufficient discharge planning services means that individuals cycle in and out of the jail again and again, in some cases returning to a Hawaiʻi correctional facility within 24 hours of release.

55. Defendants also routinely discharge individuals directly from solitary confinement to the community, with no preparation for the transition and little regard for the well-established lingering psychological effects of isolation.

## II.    Defendants Fail to Take Basic Measures to Prevent Suicide

56. Defendants fail to take basic measures to prevent suicide in its jails and prisons.  Defendants' policies and procedures fail to identify individuals at risk of suicide during intake, provide insufficient support to those who demonstrate self-harm or express suicidal ideation, and treat individuals in a punitive manner that discourages reporting of suicidality and increases the risk that suicide attempts and suicides will occur.  Defendant DPS has no suicide watch cells at three of its eight facilities.  As a result, individuals are dying by suicide at an alarmingly high rate in Defendant DPS's jails and prisons.  According to statistics from the DoJ Bureau of Justice, from 2000-2014, Hawaiʻi had 29 suicides per 100,000 prisoners per year, nearly double the national average suicide rate in state prisons of 16.67 per 100,000.

57. Defendants fail to provide sufficient supervision of people at risk of suicide. Because of insufficient custody staffing, there are few deputies to interact with and identify people who may be experiencing suicidal ideation or engaging in self-harming behaviors. If a mentally ill inmate is able to speak with a nurse about his mental health concerns he is usually told to, "go take a shower and go lay down." Ms. Fortson was not put on suicide watch before her suicide even though she had informed the medical staff that she was suicidal.

58. The absence of adequate staff is particularly troubling in its seclusion units, where individuals may not be seen by or interact with another person for hours or days at a time.

59. Defendants fail to properly train staff about suicide risks and prevention. Defendants' training for custody staff fails to adequately address how to handle suicidal individuals and does not mention basic crisis intervention strategies.

## A.  Defendants Subject Individuals on Suicide Watch to Punitive and Degrading Conditions

60. Defendants grossly mistreat people who are identified as suicidal. Defendants' policies and practices are unnecessarily and inappropriately punitive, relying on excessive isolation and deprivation, which can be even

harsher than the conditions experienced by people facing disciplinary sanction.

61. When a person is identified as suicidal, Defendants strip him or her of clothes, remove the person from his or her cell, and place him or her in a cell without any personal belongings and no access to phones. The inmate is also prohibited from having visitation with family.

62. Defendants have a practice of placing individuals on suicide watch in places with known suicide hazards. For example, the cells used for suicide watch contain long metal rods, fixtures, sinks, vents, and other protrusions that can be used by individuals attempting to hang themselves. Some of these cells contain large slabs of concrete which inmates can hide behind, creating a blind spot for those assigned to monitor suicidal inmates. Defendants own mental health experts have found that all of Hawaiʻi's suicide watch cells have unsafe features for people at risk of suicide or self-harm. Yet Defendants have failed to address these known hazards in correctional facilities.

63. Defendants rely excessively and inappropriately on "suicide smocks," which are garments designed to prevent a person from using the fabric as a noose or to otherwise commit suicide. Suicide smocks are heavy, bulky, uncomfortable, and stigmatizing. Defendants use suicide smocks

indiscriminately and for excessively long periods of time, in some cases lasting several months. In addition, Defendants force inmates to wear these smocks with no other clothing, including underwear -- even after they are no longer suicidal, which is a degrading and punitive practice.

64. Inmates on suicide watch are not allowed to go outside, brush their teeth, or practice basic hygiene. In some cases, these inmates have not showered for months. In some suicide watch cells bright lights are left on 24 hours a day which interferes with the inmate's ability to sleep and aggravates the inmate's psychological distress.

65. Suicide watch cells are often filthy, with walls and food slots smeared with other inmates' blood and feces, and reek with the smell of human waste. Many of these cells are infested with cockroaches.

66. Mentally ill inmates on suicide watch complain that correctional staff harass, insult, and taunt them which further hinders their mental health. Some staff even force inmates on suicide watch to attack one another for sport.

67. Defendants' practice of subjecting people who are suicidal to punitive isolation and deprivations is extremely harmful, exacerbating existing mental health crises. Research indicates that these types of punitive responses to suicidality makes incarcerated people reluctant to discuss their

25

suicidal thoughts because of the harsh conditions they will face while on suicide watch. Defendants' policies and practices place an already vulnerable population at a high risk of further decompensation and death.

**B.  Defendants Deprive Suicidal and Self-Harming Inmates of Basic Mental Health Care**

68.  Defendants have a policy and practice of maintaining suicide watch facilities that offer no meaningful treatment. Usually the only people who interact with inmates on suicide watch are correctional officers who periodically check on them via video surveillance, medication assistants who dispense pills, and/or social workers who talk to them through the front of their cells.

69.  In or around 2015, the ratio of correctional staff per inmate on suicide watch was 1 to 1. Since the use of monitoring via closed-circuit television was adopted, the ratio dropped to one correctional staff person to every four suicidal inmates to monitor via video surveillance. According to one Hawaiʻi Correctional Facility Sergeant, instead of monitoring the suicidal inmates, staff spend the majority of their time on suicide watch sleeping. Although suicidal inmates are required to be surveilled once every five to fifteen minutes, depending on the physician's orders, correctional staff typically only look at their monitors two to three times throughout an eight-hour shift: once at the start of their shift, once at the end of their shift, and,

occasionally, once during their shift.  If an inmate on suicide watch needs

assistance from a correctional staff person, he or she must bang on his or her

door and scream for help.

70.   Defendants fail to properly execute DoJ mandated suicide evaluation

protocols, frequently eliminating some of the required monitoring steps.

Under DoJ standards, when a suicidal inmate is provided a mental health

evaluation he or she must be assessed at three different levels to determine

whether the inmate is a suicide risk.  In Hawaiʻi's correctional facilities an

inmate often goes from being admitted for suicide watch to being discharged

into the general prison population without any follow-up.  This procedure

would only be appropriate if the inmate never should have been placed under

suicide watch in the first place.  This change in procedure eliminates the

mandated protocol and fails to monitor the triggers and behaviors that

caused the prisoner to enter suicide watch.  As a result, prisoners are not

screened, evaluated, and/or treated before being released back into the

general population.  For example, in 2016, after Ms. Fortson was sent to an

emergency room after a failed suicide attempt, she was not given any

subsequent mental health evaluation or treatment.  When the medical unit

discharged her a few days after her suicide attempt she was released directly

into the general prison population.

III.    **Inmates Suffer Ongoing Irreparable Injury as a Result of Defendants' Actions**

71.    The Defendants' systemic failure to provide basic mental health services to people incarcerated in Hawai'i's Correctional Facilities described herein harmed the Inmates and members of the proposed Class.    The following allegations of individualized harm suffered by the Inmates are illustrative of the extent and severity of damages sustained by members of the proposed Class resulting from Defendants' actions.

A.    **Plaintiff Donna Opulento, on behalf on her daughter, Jessica Fortson**

72.    Ms. Fortson was incarcerated at WCCC when she committed suicide on July 11, 2017.

73.    In 2008, Ms. Fortson was diagnosed with schizophrenia.  In 2010, Ms. Fortson was diagnosed with anxiety disorder, attention-deficit hyperactivity disorder, post-traumatic stress disorder, and borderline personality disorder. In 2014, Ms. Fortson was diagnosed with bipolar disorder.

74.    Although Ms. Fortson was diagnosed with schizophrenia, bipolar disorder, and borderline personality disorder, among other mental health illnesses, she was never placed in the mental health unit at WCCC.

75. Throughout her incarceration at WCCC, Ms. Fortson requested to speak with a mental health professional for treatment of her mental health illnesses. The WCCC medical nurses told Ms. Fortson, "not to waste their time."

76. Ms. Fortson repeatedly informed the correctional staff that she was suicidal, but she was never provided with any mental health services and was never placed on suicide watch.

77. In or around August 2016, Ms. Fortson attempted to kill herself in her cell. She tied a bed sheet around her neck and hung herself from a fixture in her cell. A correctional guard found Ms. Fortson while she was suffocating and was able to loosen the bed sheet from around her neck before she died. Ms. Fortson was brought to the medical unit where she was treated for her physical injuries. After being released from the medical unit she was sent directly to the general population. At no point after Ms. Fortson's attempt to commit suicide did she receive any mental health evaluation or mental health treatment.

78. After her first attempt to commit suicide, Ms. Fortson continued to ask the correctional staff for mental health assistance and informed the medical nurses she was suicidal. The correctional and medical staff continued to ignore Ms. Fortson's requests for assistance.

79. Upon information and belief, Ms. Fortson had been in and out of solitary confinement for several months before she committed suicide.

80. Approximately two months before Ms. Fortson's death by suicide, she was ordered to be placed in lockdown. Per WCCC policy, an inmate must sign an acknowledgement of the lockdown order within 45 days of the infraction that gives rise to the lockdown order. If an inmate is not provided this form within 45 days, the lockdown order is cancelled. Ms. Fortson was first given the lockdown acknowledgement form 46 days after the infraction that gave rise to her lockdown order. Per WCCC policy, Ms. Fortson should not have been placed in lockdown before her death. WCCC staff ignored the 45-day notice requirement, and placed Ms. Fortson in lockdown a few days before she committed suicide.

81. Before Ms. Fortson was placed in lockdown, she informed the medical nurses who evaluated her that she was suicidal. Those nurses did not put her on suicide watch and did not provide her with a mental health evaluation or mental health treatment.

82. A few days after Ms. Fortson was placed in lockdown, Ms. Fortson committed suicide in her lockdown cell.

**B. Frank Hampp**

83. Mr. Hampp currently is detained at the Halawa Correctional Facility as a sentenced inmate.

84. In 2014, Mr. Hampp was diagnosed with Bipolar I disorder.

85. In November 2017, Mr. Hampp was incarcerated at OCCC.  At or around this time, Mr. Hampp's mother, Althea Mikaele ("Ms. Mikaele") called OCCC and informed the OCCC correctional staff that Mr. Hampp had bipolar disorder and required medication.  After Ms. Mikaele's phone call, Mr. Hampp started receiving medication for his mental illness.  Upon his release in in the summer or fall of 2017, Mr. Hampp was not provided with a mental health evaluation or a temporary supply of his medication.

86. In or around January 2018, Mr. Hampp was again incarcerated at OCCC as a pretrial detainee.  Upon his admittance, Mr. Hampp was not provided a mental health evaluation or a prescription for his bipolar disorder, even though his OCCC records indicated that he had received medication for his mental illness during his previous incarceration in 2017.

87. As a result of not receiving his medication for several months, Mr. Hampp began exhibiting psychotic and suicidal behavior.  Instead of providing Mr. Hampp a mental health evaluation or mental health treatment, DPS officials and/or guards placed Mr. Hampp in solitary confinement.

88. On or around March 19, 2018, while Mr. Hampp was housed in solitary confinement, prisons guards transported him to the recreational area for a brief period of time.  Although the correctional officers were required to shackle Mr. Hampp they failed to do so.  Because Mr. Hampp was suicidal, unsupervised, and unshackled Mr. Hampp threw himself over the balcony in an attempt to kill himself.  Mr. Hampp survived his suicide attempt but is now a paraplegic.

**C.    Joseph Tui**

89. Mr. Tui is currently detainee at the Halawa Correctional facility where he requires and receives mental health care and medications on a regular basis.

**<u>COUNT ONE</u>**
**42 U.S.C. Section 1983; Violation of the Eighth Amendment's Prohibition Against Cruel and Unusual Punishment**
**(The Estate, Mr. Hampp,Mr. Tui, and the Proposed Class Members' Claim Against Defendant DPS and Defendants ESPINDA and TAKENAKA, in their Official Capacities)**

90. Plaintiffs incorporate by reference each and every allegation contained in the above paragraphs as if set forth fully herein.

91.   42 U.S.C. section 1983 (hereinafter, "Section 1983") provides that:

Every person, who under color of any statute, ordinance, regulation, custom, or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the

constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

92. Mr. Hampp, Mr. Tui, and the proposed Class members are persons within the jurisdiction.

93. Claims for Constitutional violations under Section 1983 survive the death of the injured party in this jurisdiction, therefore the Estate has standing to bring claims against Defendants.

94. All of the Defendants to this claim are potentially liable under Section 1983 to the Plaintiffs and the proposed Class members for injunctive relief.

95. Plaintiffs are informed and believe and thereupon allege that Defendants acted and/or purported to act herein under color of state law, statutes, regulations, customs, practices, and/or usages of the State of Hawai'i, and/or the DPS.

96. Pursuant to the Eighth Amendment's prohibition against cruel and unusual punishment Defendants have an affirmative obligation to provide for the safety and mental health of Inmates and the proposed Class members.

97. Inmates and the proposed Class members' Eighth Amendment right to receive necessary and adequate mental health care has been clearly established and applies to inmates incarcerated in state prisons pursuant to the due process clauses of the Fifth and Fourteenth Amendment.

98. DPS and any reasonable DPS official knew or should have known of this right at the time of the complained conduct as it was clearly established at that time.

99. Defendants are and were, at all times relevant, policymakers for the DPS and in that capacity established policies, procedures, customs, and/or practices for the same.

100. At all times relevant hereto, Defendants acted and continue to act with willful and deliberate disregard for Inmates and the proposed Class members' safety and mental health by failing to enact and/or follow appropriate policies, procedures, and regulations to respond to the needs of mentally-ill inmates and prevent suicides and mental health-related injuries.

101. Defendants exhibited and continued to exhibit deliberate indifference to the mental health needs of Inmates and the proposed Class members during their transition from prison to the general public.

102. Specifically, Defendants developed, ratified, and maintained policies, customs, and regulations which cause, encourage, tolerate and approve of the following conduct which was the direct and proximate cause of Mr. Hampp and the proposed Class members' injuries and Ms. Fortson's death:

a. Terminated the employment of mental health practitioners who played a key role in developing the policies and protocols that brought OCCC into

compliance with federal standards and were among the few people who could have provided the supervision necessary to comply with the DoJ Settlement Agreement;

b.  Failed to fill vacancies with qualified mental health practitioners, or if vacancies were filled, the individuals employed were unqualified and/or lacked the credentials to treat inmates with mental illnesses;

c.  Misapplied legislative funds earmarked for filling vacancies for mental health positions;

d.  Banned the few remaining mental health employees from making rounds on weekends, nights, and holidays, including daily clinical monitoring of inmates on suicide watch;

e.  Failed to respond to Inmates and the proposed Class members' repeated requests for mental health treatment;

f.  Failed to provide Inmates and the proposed Class members with necessary psychiatric medications;

g.  Failed to provide mental health evaluation to Inmates and the proposed Class members who had documented mental health disabilities;

h.  Failed to adequately train and supervise their employees and/or agents to prevent the occurrence of the Constitutional and statutory violations suffered by Inmates and the proposed Class members;

i.  Failed to provide "comprehensive mental health treatment plans" for Inmates and the proposed Class members;

j.  Failed to follow DoJ-approved suicide watch protocols; and

k.  Failed to promulgate appropriate policies or procedures or take other measures to prevent the Constitutional and statutory violations suffered by Inmates and the proposed Class members, among other things.

103.  Defendants committed and continue to commit the above-mentioned actions with deliberate indifference, malice, and disregard for Inmates and the proposed Class members' health and safety.  Defendants knew or should have known that committing the acts described above would result in serious and/or fatal injuries to Inmates and the proposed Class members, in violation of their Eighth Amendment rights.

104.  Defendants knew or should have known that the aforementioned policies, practices, acts, and omissions place Inmates and the proposed Class members at unreasonable, continuing, and foreseeable risk of developing or exacerbating serious mental health problems.

105.  The acts and omissions of Defendants constitute cruel and unusual punishment of Inmates and the proposed Class members and violate the protections of the Eighth Amendment to the United States Constitution.

36

106. As a direct and proximate result of the unconstitutional policies, practices, acts, omissions, and deliberate indifference of Defendants to Inmates and the proposed Class members' mental health needs, Inmates and the proposed Class members have suffered and will continue to suffer immediate and irreparable injury, including psychological and emotional injury so extreme that it has caused Inmates and the proposed Class members to attempt, and in Ms. Fortson's case, successfully commit suicide.

107. Defendants have violated Inmates and the proposed Class members' rights and privileges secured by the Constitution and laws of the United States and are therefore subject to civil liability and injunctive and declaratory relief pursuant to Section 1983.

## COUNT TWO
**42 U.S.C. Section 1983; Violation of Procedural Due Process Under the Fourteenth Amendment**
   **(The Estate, Mr. Hampp, Mr. Tui, and the Proposed Class Members' Claim Against Defendant DPS and Defendants ESPINDA and TAKENAKA, in their Official Capacities)**

108. Plaintiffs incorporate by reference each and every allegation contained in the above paragraphs as if set forth fully herein.

109. Section 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom, or usage of any state or territory or the District

of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

110. Mr. Hampp, Mr. Tui, and the proposed Class members are persons within the jurisdiction.

111. Claims for Constitutional violations under Section 1983 survive the death of the injured party in this jurisdiction, therefore the Estate has standing to bring claims against Defendants.

112. All of the Defendants to this claim are potentially liable under Section 1983 to the Plaintiffs and the proposed Class members for injunctive relief.

113. Plaintiffs are informed and believe and thereupon allege that Defendants acted and/or purported to act herein under color of state law, statutes, regulations, customs, practices, and/or usages of the State of Hawai'i, and/or the DPS.

114. Defendants have an affirmative obligation to implement procedures to preserve Inmates and the proposed Class members' due process rights under the Fourteenth Amendment to the U.S. Constitution.  This right has been clearly established and applies to inmates incarcerated in state prisons

pursuant to the due process clauses of the Fourteenth Amendment to the U.S. Constitution.

115. DPS and any reasonable DPS official knew or should have known of this right at the time of the complained conduct as it was clearly established at that time.

116. Defendants are and were, at all times relevant, policymakers for the DPS and in that capacity established policies, procedures, customs, and/or practices for the same.

117. At all times relevant hereto, Defendants acted and continued to act with willful and deliberate indifference to Inmates and the proposed Class members' procedural due process rights by failing to enact and/or follow constitutionally appropriate policies, procedures, and regulations.

118. As discussed above, under the direction of Defendants, DPS correctional employees fail to: 1) screen Inmates and the proposed Class members for mental illness; 2) manage Inmates and the proposed Class members' mental health needs; 3) prescribe, dispense, or monitor Inmates and the proposed Class members' medication; 4) provide counseling to Inmates and the proposed Class members; and 5) respond to Inmates and the proposed Class members' numerous requests for mental health treatment. Predictably,

Inmates and the proposed Class members begin to exhibit mentally-unstable behavior.

119. As a result of Inmates and proposed class members' behavior, and because Defendants fail to hire, train, and supervise adequate, qualified mental health personnel, DPS correctional staff place Inmates and the proposed Class members in solitary confinement as an unlawful means to control Inmates, a common practice in Hawai'i's Correctional Facilities

120. This policy and practice punishes Inmates and the proposed Class members for behavior directly related to their mental illness and exacerbate their mental and emotional suffering.

121. Although Inmates and the proposed Class members have a right to a disciplinary hearing before being placed in solitary confinement, Inmates and the proposed Class members cannot meaningfully participate in any disciplinary process hearing, if one was provided to them, because Inmates and the proposed Class members lack the mental competence to respond to the charges against them. This failure to provide Inmates and the proposed Class members with a meaningful disciplinary hearing before being placed in solitary confinement violates their due process rights under the U.S. Constitution.

122. Defendants developed, ratified, and maintained policies and customs which cause, encourage, tolerate, and approve of the aforementioned conduct which violates Inmates and the proposed Class members' Fourteenth Amendment rights.

123. Defendants knew or should have known that enacting a policy and practice that places Inmates and the proposed Class members, who are clearly mentally-ill, into solitary confinement or fail to meaningfully evaluate Inmates and the proposed Class members' mental health status before placing them in solitary confinement is a deprivation of their liberty in violation of their due process rights.

124. The costs to Defendants of providing procedural safeguards are minimal, and any such costs are outweighed by the great risk of erroneous deprivation of liberty that exists under the current policies and practices of Defendants.

125. Defendants commit the above-mentioned actions with deliberate indifference, malice, and disregard for Inmates and the proposed Class members' due process rights. Defendants knew or should have known that committing the acts described above would result in a violation of Inmates and the proposed Class members' Fourteenth Amendment rights.

126. As a proximate result of the conduct of Defendants, Inmates and the proposed Class members have suffered, and will continue to suffer, deprivation of liberty and privileges without any procedural due process in violation of the Fourteenth Amendment's guarantee of due process.

127. Defendants have violated Inmates and the proposed Class members' rights and privileges secured by the Constitution and laws of the United States and are therefore subject to civil liability and injunctive and declaratory relief pursuant to Section 1983.

## COUNT THREE
### 42 U.S.C. Section 1983; Failure to Train or Supervise
### (The Estate, Mr. Hampp, Mr. Tui, and the Proposed Class Members' Claim Against Defendant DPS and Defendants ESPINDA and TAKENAKA, in their Official Capacities)

128. Plaintiffs incorporate by reference each and every allegation contained in the above paragraphs as if set forth fully herein.

129. Section 1983 provides that:

> Every person, who under color of any statute, ordinance, regulation, custom, or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

42

130. Mr. Hampp, Mr. Tui, and the proposed Class members are persons within the jurisdiction.

131. Claims for Constitutional violations under Section 1983 survive the death of the injured party in this jurisdiction, therefore the Estate has standing to bring claims against Defendants.

132. All of the Defendants to this claim are potentially liable under Section 1983 to the Plaintiffs and the proposed Class members for injunctive relief.

133. Plaintiffs are informed and believe and thereupon allege that Defendants acted and continue to act herein under color of state law, statutes, regulations, customs, practices, and/or usages of the State of Hawaiʻi, and/or the DPS.

134. Inmates and the proposed Class members have the following clearly established rights:

    a.    The right to adequate mental health treatment under the Eighth Amendment's prohibition against cruel and usual punishment; and

    b.    The right to procedural due process under the Fourteenth Amendment.

135. Defendants knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time.

136.   The failure of Defendants to adequately hire, train, or supervise individuals under its control or employ as described herein, deprived Inmates and the proposed Class members of their Constitutional rights and caused them other damages.

137.   Defendants are and were, at all times relevant, policymakers for the DPS and in that capacity established policies, procedures, customs, and/or practices for the same.

138.   Defendants developed and maintained policies, procedures, customs, and/or practices exhibiting deliberate indifference to the Constitutional rights of its inmates, which are and were the direct and proximate cause of the violations of Inmates and the proposed Class members' Constitutional rights.

139.   Defendants have created and tolerated an atmosphere of lawlessness and have developed and maintained long-standing, department-wide customs, enforcement-related policies, procedures, customs, practices that have resulted in the failure to properly train and/or supervise its correctional officers and mental health staff in a manner amounting to deliberate indifference to Inmates and the proposed Class members' Constitutional rights.

140. Specifically, Defendants and the proposed Class members engaged and continue to engage in a policy and practice of failing to:

    a. Hire sufficient qualified mental health staff to diagnose and treat its mentally-ill population;

    b. Provide adequate training to its correctional staff regarding mentally-ill inmates, including how to respond to their requests for treatment;

    c. Train and supervise correctional staff to ensure suicidal and mentally-ill inmates are not placed in solitary confinement to punish them for behavior related to their mental illness or suicidal ideation;

    d. Train and supervise correctional staff to ensure that suicide watch protocol is followed;

    e. Train and supervise correctional staff to ensure mentally-ill inmates receive appropriate and comprehensive mental health treatment plans;

    f. Train and supervise correctional staff to ensure mentally-ill inmates receive a mental health evaluation and the proper prescription upon release to the general public;

    g. Train and supervise DPS correctional staff who monitor suicidal inmates (*i.e.*, although suicidal inmates are required to be monitored once every five to fifteen minutes, correctional staff typically only

look at their video surveillance monitors two to three times throughout an eight-hour shift); and

h. Train and supervise staff with respect to reporting and/or responding to violations of mentally-ill inmates' Constitutional rights, among other things.

141. Defendants committed the above-mentioned actions with deliberate indifference, malice, and disregard for Inmates and the proposed Class members' Constitutional rights.

142. Defendants deliberate failure to adequately hire, train, or supervise individuals in their employ or under their control and supervision, as described above, resulted in correctional staff who consistently engaged in the following behaviors and practices:

a. Treating only a fraction of its mentally-ill inmates and encouraging the few mental health staff that remained to take short cuts, such as writing poor treatment plans or inappropriately staffing therapy groups;

b. Failing to identify and treat inmates with mental illness;

c. Discriminating against inmates by placing them in isolation to punish them for behavior directly related to their mental illness thereby exacerbating the mental and emotional suffering of these inmates;

d.  Allowing ongoing monitoring of mentally ill inmates on psychotropic medication by psychology assistants or medication assistants who have not been adequately trained to convey an inmate's concerns or symptoms to a psychiatrist; and

e.  Failing to properly train staff about suicide risks and prevention, among other things.

143.  The behavior of DPS employees conformed to the aforementioned official policies, customs, and practices.

144.  Defendants knew or should have known that failing to adequately train or supervise correctional officers with respect to the needs of mentally-ill inmates would result in a violation of Inmates and the proposed Class members' Constitutional rights.

145.  The inadequate training and supervision provided by Defendants mentioned above resulted from a deliberate choice to follow a course of action from among various alternatives available to Defendants.

146.  As a direct and proximate result of the failure to properly hire, train and/or supervise prison staff by Defendants, Inmates and the proposed Class members suffered actual physical and emotional injuries, death, and other losses as described herein.

147. As a proximate result of Defendants' failure to properly train and/or supervise prison staff, Inmates and the proposed Class members have suffered, and will continue to suffer actual physical and emotional injuries, death, a deprivation of their civil rights, and are subject to immediate and irreparable harm.

148. Defendants have violated Inmates and the proposed Class members' rights and privileges secured by the Constitution and laws of the United States and are therefore subject to civil liability and injunctive and declaratory relief pursuant to Section 1983.

## COUNT FOUR
**42 U.S.C. Section 12132 and 29 C.F.R. Section 35.152(b)(1)**
**Americans with Disabilities Act**
**(The Estate, Mr. Hampp, Mr. Tui, and the Proposed Class Members'**
**Claim Against Defendant DPS and Defendants ESPINDA and**
**TAKENAKA, in their Official Capacities)**

149. Plaintiffs incorporate by reference each and every allegation contained in the above paragraphs as if set forth fully herein.

150. Each of Hawaiʻi's correctional facilities housing Inmates and the proposed Class members is a public entity as defined in 42 U.S.C. Section 12131. Defendants at all relevant times acted in their official capacities as a representative of at least one of these public entities.

151. Inmates and proposed Class members are qualified as individuals with a disability as defined under the Americans with Disabilities Act (hereinafter "ADA") and regulations promulgated thereunder including 42 U.S.C. Section 12131(2) and Section 12102(2). Inmates and the proposed Class members have mental impairments that substantially limit one or more major life activity or have a history of having such impairments.

152. Inmates and the proposed Class members meet the essential eligibility requirements for the receipt of mental health services or the participation in programs or activities provided by Defendants.

153. Defendants have discriminated against the Inmates and proposed Class members on the basis of their disabilities in the following ways:

   a. Refusing to thoroughly diagnose mental health issues of Inmates and proposed Class members and provide them with proper treatment despite Defendants' knowledge that these inmates suffer from serious mental illness;

   b. Failing to reasonably accommodate the needs created by Inmates and proposed Class members' disabilities;

   c. Discriminating against Inmates and proposed Class members by placing them in isolation to punish them for behavior directly related to

their mental illness thereby exacerbating the mental and emotional suffering of these inmates;

d.  Discriminating against Inmates and proposed Class members in a manner which increase the severity of their illness by such methods as depriving them of clothes, heat, or sanitary surroundings; and

e.  Failing to reasonably accommodate the Inmates and the proposed Class members' disabilities by refusing to transfer Inmates and some proposed Class members to mental health units and housing them in general population divisions, where the staff and guards in such divisions are not trained to interact with seriously mentally ill inmates.

154.  In acting in the manner alleged above, Defendants have unlawfully discriminated against Inmates and the proposed Class members in violation of the ADA.

155.  As a proximate result of Defendants' wrongful conduct, Inmates and the proposed Class members have suffered, and will continue to suffer, immediate and irreparable harm and injury, including physical, psychological, and emotional injury, including the risk of death.

156.  Defendants have violated Inmates and the proposed Class members' rights and privileges secured by the laws of the United States and are therefore subject to civil liability and injunctive and declaratory relief.

## <u>COUNT FIVE</u>

**Section 504 of Rehabilitation Act, 29 U.S.C. Section 794**
**(The Estate, Mr. Hampp, Mr. Tui, and the Proposed Class Members'**
**Claim Against Defendant DPS and Defendants ESPINDA and**
**TAKENAKA, in their Official Capacities)**

157.  Plaintiffs incorporate by reference each and every allegation contained in the above paragraphs as if set forth fully herein.

158.  Upon information and belief, the DPS receives federal financial assistance, thus making it subject to Section 504 of the Rehabilitation Act, 29 U.S.C. Section 794(a) and Section 705(20).

159.  Inmates and proposed Class members are qualified individuals with a disability as defined in the Rehabilitation Act and implementing regulations.  Inmates and the proposed Class members have mental impairments that substantially limit one or more major life activities; or they have records of having such impairments; or they are regarded as having such impairments.

160.  Inmates and the proposed Class members meet the essential eligibility requirements for the receipt of rehabilitation services or the right to participate in programs or activities provided by Defendants.

161.  Defendants have discriminated against the Inmates and proposed Class members based upon their disabilities in the following ways:

a.  Refusing to thoroughly diagnose mental health issues of Inmates and proposed Class members and provide them with proper treatment despite Defendants' knowledge that these inmates suffer from serious mental illness;

b.  Failing to reasonably accommodate the needs created by Inmates and proposed Class members' disabilities;

c.  Discriminating against Inmates and proposed Class members by placing them in isolation to punish them for behavior directly related to their mental illness thereby exacerbating the mental and emotional suffering and of these inmates;

d.  Discriminating against Inmates and proposed Class members in a manner which increase the severity of their illness by such methods as depriving them of clothes, heat, or sanitary surroundings; and

e.  Failing to reasonably accommodate the Inmates and proposed Class members' disabilities by refusing to transfer Inmates and some proposed Class members to mental health units and housing them in general population divisions, where the staff and guards in such divisions are not trained to interact with seriously mentally ill inmates.

162. In acting in the manner alleged above, Defendants have unlawfully discriminated against Inmates and the proposed Class members in violation of the Rehabilitation Act.

163. As a proximate result of Defendants' wrongful conduct, Inmates and the proposed Class members have suffered, and will continue to suffer immediate and irreparable harm and injury, including physical, psychological, and emotional injury, including the risk of death.

WHEREFORE, Plaintiffs pray for relief as follows:

1. For certification of the proposed Class;

2. For injunctive and declaratory relief against the Defendants;

3. For appointment of a Special Master to operate the mental health branch of the Corrections Division at the Department of Public Safety; and

4. For such other relief as the Court may deem equitable and just.

DATED:    Honolulu, Hawai'i, October 6, 2023.


/s/ Eric A. Seitz
ERIC A. SEITZ
JONATHAN M.F. LOO
PAUL D. ALSTON
CLAIRE WONG BLACK
RICHARD M. CRUM

Attorneys for Plaintiffs